

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | P. Michael Mahoney |
|---|---|---|---|
| **CASE NUMBER** | 01 C 50061 | **DATE** | 1/13/2003 |
| **CASE TITLE** | | Greathouse vs. Halter | |

MOTION:

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated on the attached memorandum opinion and order, the ALJ's decision to deny benefits is sustained. The ALJ is affirmed at all steps of the disability determination process as outlined in the attached memorandum opinion and order. Plaintiff's Motion for Summary Judgment is denied. Defendant's Motion for Summary Judgment is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices

JAN 14 2002
date docketed

1/10/2003
date mailed notice

Document Number

COURT DISTRICT U.S., CLERK

03 JAN 13 PM 3:04

FILED-WD

sp
courtroom deputy's initials

docketing deputy initials

sp
mailing deputy initials

Date/time received in central Clerk's Office

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| **CRAIG M. GREATHOUSE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 01 C 50061** |
| | ) | |
| v. | ) | **Magistrate Judge** |
| | ) | **P. Michael Mahoney** |
| **WILLIAM A. HALTER,** | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Craig M. Greathouse, ("Plaintiff"), seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Supplemental Security Income ("SSI") pursuant to Title XVI of the Social Security Act (the "Act"). 42 U.S.C. §§1602, 1614(a)(3)(A). This matter is before the Magistrate Judge pursuant to consents filed by both parties on March 19, 2001. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I.    BACKGROUND

Plaintiff filed for SSI on June 30, 1997, alleging disability beginning on February 28, 1997. (Tr.62-65). Plaintiff's application for benefits was denied on October 15, 1997. (Tr. 65). On October 22, 1997, Plaintiff filed a request for reconsideration. (Tr. 69). Plaintiff's request for reconsideration was denied on November 26, 1997. (Tr. 71). Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ") on December 24, 1997. (Tr. 74). Plaintiff appeared, with counsel, before an ALJ on August 4, 1998. (Tr. 32). In a decision dated January 13,

1999, the ALJ found that Plaintiff was not entitled to SSI. (Tr. 19-26). On February 28, 1999, Plaintiff requested a review of the ALJ's decision by the Appeals Council. (Tr. 13). On October 2, 2000, the Appeals Council denied Plaintiff's request for review. (Tr. 8).

## II.     FACTS

Plaintiff was born on September 14, 1956, (tr. 62), and was forty-two years old at the time of his August 4, 1998 hearing before the ALJ. (Tr. 35). Plaintiff has completed his education through the twelfth grade. (Tr. 116). At the time of the hearing, Plaintiff, single, was living with a roommate. (Tr. 35-36). Plaintiff is a heavy smoker who allegedly smokes around three packs a day. (Tr. 48).

At the August 1998 hearing, Plaintiff testified that he stopped working after his February 28, 1997 accident. (Tr. 37). Allegedly, on February 28, 1997, Plaintiff, a truck driver, was involved in an accident whereby the semi truck he was driving rolled over causing him injury to his back. (Tr. 143). When asked by the ALJ to place parameters on his back pain (on a scale from 1 to 10 with 10 being the worst), Plaintiff testified that at times his back is a 10. (Tr. 39). However, Plaintiff also stated that his back is not a 10 all the time and, in fact, Plaintiff stated that, at the time of the hearing, he had not experienced extreme pain in his back for approximately three to four weeks. (*Id.*). On a normal day, Plaintiff stated his back is probably a 4. (Tr. 40).

At the hearing, Plaintiff testified that he was currently taking Elavil and a strong aspirin to help with his back pain. (Tr. 37). Additionally, Plaintiff stated that a hot shower helps the most to combat his back pain in addition to medication. (Tr. 41). Throughout the day, Plaintiff testified that the pain comes and goes depending on the type of activity he is involved in, but that the mornings are usually the worst until Plaintiff can limber up and take his medications. (*Id.*).

2

In terms of his activities, Plaintiff stated that he can walk a maximum of eight blocks and then he starts to get sore. (*Id.*). After walking the maximum, Plaintiff stated he would have to lay down on his back for about twenty minutes to a half hour for the pain to decrease. (Tr. 41-42). With regards to sitting, Plaintiff stated he usually can sit for about forty-five minutes to an hour but then must get up because his lower back hurts too much. (Tr. 44). At this point, Plaintiff must stand for maybe ten or fifteen minutes before the pain starts to decrease. (*Id.*).

In terms of his normal daily activities, Plaintiff stated most of his activities depend on what he did the day before and whether his back is still in pain from the prior day. (Tr. 42). However, it appears on most days, Plaintiff gets up, takes a nap, "putters" around, maybe drives over and visit a few friends, watches t.v., does the dishes, and goes fishing. (*Id.*). When asked whether Plaintiff fishes off the bank or fishes in a boat, Plaintiff stated he fishes off the bank but that he is unable to cast like he used to because casting causes pain in his back. (*Id.*). Additionally, Plaintiff is able to do his own laundry and his own cooking but he must do each chore in portions so as to do a little at time and not everything at once. (Tr. 43). Other daily tasks, such as putting on his shoes and clothes, Plaintiff stated he has a hard time performing. (Tr. 48).

When asked by the ALJ, Plaintiff stated, as long as he did not move wrong, he could pick up 10 pounds with no problem. (Tr. 45). Additionally, Plaintiff testified that he helped his aunt move her couch, although the Plaintiff stated that was not really lifting but rather lifting a little bit and then pushing. (Tr. 46). Lastly, in terms of lifting, Plaintiff stated he is able to lift a gallon of milk by the handle off the shelf at the grocery store. (*Id.*).

When questioned by his own attorney, Plaintiff stated that he has no skills other than being a truck driver. (Tr. 49). Allegedly, Plaintiff attempted to work in a factory after his injury, but was

unable to continue such work because of his back. (*Id.*). Specifically, Plaintiff stated that his job required him to take one-pound packages off the lift and place them in boxes, but the repetition of the activity was too much for Plaintiff. (*Id.*). During this job, which lasted for two days, Plaintiff testified he had to lie down during his shift for fifteen minutes until his back pain decreased. (*Id.*). Plaintiff would do this a couple times during the day.

In addition to his back pain, Plaintiff stated he goes through bouts of depression. (Tr. 50). Plaintiff's depression causes him, according to Plaintiff, to become very irritable and angry. (Tr. 51). Plaintiff stated he gets very little sleep because his back pain causes him to wake up every couple of hours. (*Id.*). Plaintiff appears to attribute most of his depression to the loss of his father and his lack of financial stability. (Tr. 51-52).

Vocational expert, James Ragains, appeared before the ALJ at Plaintiff's August 1998 hearing. (Tr. 53). The ALJ directed Mr. Ragains to assume an individual with Plaintiff's vocational characteristics and the following limitations: the "individual is limited to a full range of light work[1], except that there should be no lifting of more than 10 pounds. There should be reduced interaction with others ... [and] no continuous repetitive movements of the upper extremities." (Tr. 57). Mr. Ragains, in response, stated at the light exertion level, there are unskilled cleaning jobs such as office cleaning (30,000 jobs in Illinois) that a person with Plaintiff's characteristics and limitations could

---

[1] §404.1567(b) *Light Work*. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

perform. (Tr. 58). Additionally, Mr. Ragains stated there are some unskilled cashiering jobs or gas station type jobs (30,000 jobs in Illinois) that a person with Plaintiff's characteristics and limitations could perform. (*Id.*). When directed to assume sedentary jobs[2] with reduced interaction with others, Mr. Ragains stated such a person would be unemployable. (*Id.*).

## III.  **MEDICAL HISTORY**

Plaintiff was born on September 14, 1956. (Tr. 62). On February 28, 1997, Plaintiff, a truck driver, was involved in an accident whereby the semi truck he was driving rolled over causing him injury to his back. (Tr. 143). However, Plaintiff's medical record pre-dates his February 1997 accident.

On March 21, 1996, Plaintiff saw Dr. Martin Goldstone of the Illinois Valley Community Hospital regarding Plaintiff's bouts with depression. (Tr. 215). Dr. Goldstone reported that about four months prior, in December 1995, Plaintiff's business venture went bad causing Plaintiff to be depressed and contemplate suicide. (*Id.*). After seeing Dr. Goldstone, Plaintiff saw Dr. Joseph Chuprevich. (Tr. 207). Dr. Chuprevich diagnosed Plaintiff as suffering from a depressive disorder and admitted Plaintiff to the Omega Unit. (*Id.*).

On March 22, 1996, Jeane Pfalzgraf, a therapist in the Illinois Valley Community Hospital's Omega Unit did a comprehensive assessment of Plaintiff. (Tr. 218). Ms. Pfalzgraf reported that Plaintiff told her that his depression stems from his loss of $35,000 six months prior to March 1996 because of a bad business deal and the loss of his uncle three weeks prior. (*Id.*). Plaintiff also

---

[2] §404.1567(a) *Sedentary work.* Sedentary work involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

reported to Ms. Pfalzgraf that he abuses alcohol, can only sleep during the day and not at night, and that he has suicidal thoughts but no plan or intention on acting on those thoughts. (*Id.*). In her report, Ms. Pfalzgraf reported that Plaintiff appeared disheveled yet cooperative and somewhat guarded. (Tr. 220). Plaintiff's motor activity was normal to high psychomotor agitation at times with noticeable pacing and restlessness. (*Id.*). In terms of his mood, Ms. Pfalzgraf noted that Plaintiff appeared to be in a depressed mood with low energy and minimal expressiveness. (*Id.*). Plaintiff was ultimately discharged from the Omega Unit on March 22, 1996. (Tr. 228).

On February 28, 1997, Plaintiff attempted to turn his semi truck on U.S. Highway 30 but because of the weather and road conditions, his load shifted and his semi rolled over. (Tr. 311). Initially, it appears Plaintiff refused any treatment at the scene of the accident and instead checked himself into a motel for the night. (*Id.*). However, the next day his back started to hurt and Plaintiff went to Parkview Memorial Hospital in Fort Wayne, Indiana to have his back checked. (*Id.*). Plaintiff's orthopedic examination, performed by Dr. Thomas Dykstra, revealed:

> Cervical spine was nontender. Dorsal spine was contender. Lumbar spine showed some paraspinious spasm, but there was no bruising nor abrasions. The left traperial muscle had a bruise on it, but [Plaintiff] had no clavicular or supraclavicular pain. [Plaintiff] had no shoulder pain, elbow or wrist pain. [Plaintiff] had a superficial abrasion over the hypothenar eminence at its most ulnar aspect. Distal neurovascular status was intact and equivocal bilaterally to both hands. Back definitely had costovertebral angle tenderness bilaterally, right greater than left. Pelvis was stable to rock. Lower extremities were contender. [Plaintiff] had a little bruising to his knees and abrasions but he had walked on these. [Plaintiff] said these felt good. Distal neurovascular examination of his lower extremities were intact and equivocal bilaterally. Cranial nerves II through XII were intact and otherwise as above.

(Tr. 311-312). Dr. Dystra diagnosed Plaintiff as suffering from: acute bilateral kidney contusions with microscopic hematuria, minor close head injury without loss of consciousness, multiple contusions and abrasions, and lumbar strain. (Tr. 312). Dr. Dykstra prescribed Lortab, Norflex and ibuprofen and then discharged Plaintiff. (*Id.*).

On April 3, 1997, back in Illinois, Plaintiff saw Dr. Gregory Shenk, Radiologist, of the Illinois Valley Magnetic Resonance Imaging Center. (Tr. 233). Dr. Shenk found that Plaintiff had

> A large left ventral central extradural defects [sic] present
> upon the thecal sac at the L2-L3 disc space level best
> visualized on axial T1 images #5 & #6. The left L3 nerve root
> is displaced posteriorly and left laterally. A right ventral
> central extradural defects [sic] noted upon the thecal sac at the
> L4-L5 disc space level best visualized on axial images #11 &
> #12. Normal height but decreased T2 signals present from the
> [sic] all the lumber intervertebral disc spaces except fro the
> L1-L2 disc. The psoas paraspinal muscles, abdominal aorta,
> inferior vena cava and conus medulliaris are normal.
> Schmorl's nodes present within the inferiror L1 vertebral body
> endplate.

(Tr. 233). Dr. Shenk reported Plaintiff was suffering from degenerate left centrally herniated L2-L3 disc which is displacing the left L3 nerve root posteriorly and left laterally. (*Id.*) Additionally, Dr. Shenk noted degenerated right centrally bulging questionably herniated L4-L5 disc with questionable posterior displacement of the right L5 nerve root. (*Id.*).

On April 24, 1997, Plaintiff saw Dr. Wayne Roden of Physical Medicine and Rehabilitation Associates. (Tr. 249). Dr. Roden performed an electroneurodiagnostic study of Plaintiff's lower extremities and related lumbar and sacral paraspinal areas. (*Id.*). In terms of Plaintiff's EMG, Dr. Roden reported abnormal muscle membrane irritability present in the left L2, bilateral L5, and right S1 paraspinal areas. (*Id.*). Additionally, Dr. Roden found membrane irritability present in the left

vastus medialis, right posterior tibialis, extensor hallucis longus, and peroneus longus muscles. (*Id.*). With regard to Plaintiff's NCS, Dr. Roden reported Plaintiff's left and right tibial H reflexes were within normal limits. (*Id.*). The left and right common peronela latencies, velocities, evoked responses, and F waves were within normal limits. (*Id.*). Additionally, the left and right tibial latencies, velocities, evoked responses, and F waves were within normal limits. (*Id.*). Overall, Dr. Roden opined that his findings were consistent with the presence of an active motor nerve root compromise that appeared to involve primarily the right L5 nerve root with possible additional involvement of the right S1 nerve root. (Tr. 250). Also, Dr. Roden reported his findings were consistent with the presence of an active nerve root irritation that appeared to involve primarily the left L3 nerve root. (*Id.*). Finally, Dr. Roden reported that, at the time of his examination, there was no evidence of active entrapment syndrome or peripheral neuropathy involving the nerves tested. (*Id.*).

On May 8, 1997, Plaintiff saw Dr. Robert Eilers for a follow-up to his April 24, 1997 diagnosis. (Tr. 246). Dr. Eilers noted Plaintiff was medically and neurologically stable. (*Id.*). An MRI performed on Plaintiff showed a centrally herniated disc L2-L3 at the L3 nerve root consistent with Plaintiff's EMG, degenerative right central bulging at L4-L5, and posteriro displacement of the right L5 nerve root. (*Id.*). Dr. Eilers reported that Plaintiff will continue with conservative physical therapy but noted concern that Plaintiff may need to have surgical decompression depending on his progress. (*Id.*). Dr. Eilers recommend that Plaintiff remain off work for at least one month and continue with physical therapy. (*Id.*).

Plaintiff saw Dr. Eilers again on May 22, 1997. (Tr. 245). Dr. Eilers reported Plaintiff's range of motion had improved. (*Id.*). Most notably, Dr. Eilers reported Plaintiff's flexibility and

mobility improved and that Plaintiff appeared to be responding excellently to physical therapy. (*Id*.). Also in this report, Dr. Eilers retracted from his May 8, 1997 concern regarding surgery and instead noted that Plaintiff will certainly be able to avoid surgical intervention at this time. (*Id*.). Dr. Eilers recommended that Plaintiff continue the conservative course of physical therapy. (*Id*.).

On June 22, 1997 Plaintiff was admitted to the emergency room. (Tr. 236). According to the emergency medical services report, Plaintiff was found on a store floor partially conscious and alert and smelling of alcohol on his breath. (*Id*.). Plaintiff informed the emergency medical crew that his "back gave out" and he fell. (*Id*.). In route to the hospital, Plaintiff was given oxygen and a neck collar. (*Id*.). Plaintiff was discharged from the hospital on June 23, 1997 and told to contact his physician for treatment. (Tr. 242).

Plaintiff's mood apparently took a drastic change after his fall on June 22, 1997. On June 26, 1997, Plaintiff saw Dr. Eilers. (Tr. 244). Dr. Eilers reported Plaintiff was "extremely angry and frustrated with the fact that he is not receiving benefits." (*Id*.). Plaintiff indicated that his lack of money prevented him from receiving additional help, both mental and physical, and that he may be prone to violence. (*Id*.). Additionally, although Plaintiff's TNS unit appeared to be helping relieve Plaintiff of pain, Plaintiff requested additional pain medication. (*Id*.). Plaintiff apparently informed Dr. Eilers that he was attempting to get Vicodin illegally off the street to help with the pain. (*Id*.). Dr. Eilers recommended Plaintiff seek psychological counseling but Plaintiff stated he does not have the money. (*Id*.). Plaintiff's physical therapy was postponed for approximately two months. (*Id*.).

Plaintiff saw Dr. Eilers once again on August 21, 1997. (Tr. 270). Dr. Eilers reported Plaintiff's mood appeared much calmer and Plaintiff appeared less angry. (*Id*.). Plaintiff indicated to Dr. Eilers that he attempted to drive a semi truck to test for increased pain. (*Id*.). However, Dr.

Eilers reported that he informed Plaintiff that he probably will not be able to return to truck driving and that he should instead look to some retraining for light/sedentary clerical work or possibly dispatcher positions. (*Id.*). Dr. Eilers ended Plaintiff's conservative physical therapy and recommended Plaintiff continue with his home exercise program. (*Id.*).

Plaintiff was referred for psychological testing to assist in the determination of social security disability status on August 29, 1997. (Tr. 256). Dr. Mark Langut, a licensed clinical psychologist, administered a clinical interview, a psychological consultation, and a mental status examination. (*Id.*). Dr. Langut reported Plaintiff suffers from pain subsequent to his truck accident, ulcers/stomach problems, alcohol abuse, stress, and depression. (Tr. 257). In terms of his substance abuse, Dr. Langut noted that Plaintiff informed him that "I drank all my life ... I can take it or leave it." (*Id.*). Plaintiff admitted to Dr. Langut that he uses alcohol as a pain killer due to increased stress and depression. (*Id.*). In terms of Plaintiff's mental status, Dr. Langut reported Plaintiff has feelings of hopelessness and resentment towards others. (*Id.*).

Dr. Rito Maningo saw Plaintiff on September 5, 1997. (Tr. 260). Dr. Maningo did a full examination of Plaintiff for the Illinois Department of Rehabilitation Services, Bureau of Disability Determination. (*Id.*). Most notably, Dr. Maningo reported that Plaintiff is able to walk 1 to 2 miles everyday, (tr. 261), and that an examination of Plaintiff's lumbar spine showed no evidence of acute inflammatory conditions, but did reveal some evidence of lumbar muscle spasms on palpation. (Tr. 262). Plaintiff showed some degree of difficulty in walking on his toes or heels, and squatting and rising, but showed no difficulty in getting on and off the examining table or tandem walking. (Tr. 263). Dr. Maningo's diagnostic impressions included a finding of chronic lower back pain, a herniated disc at L2-L3 level and no evidence of radiculopathy. (Tr. 263-264).

On September 16, 1997 Dr. James Graham filled out Plaintiff's capacity assessment. (Tr. 160). Dr. Graham reported that Plaintiff can occasionally lift fifty pounds, frequently lift twenty-five pounds, stand and/or walk for a total of about six hours in an eight hour workday, sit about six hours in an eight hour day, and push and/or pull an unlimited amount. (Tr. 161). In terms of his mental capacity assessment, Dr. Graham indicated Plaintiff is not significantly limited in understanding and memory, sustained concentration and persistence, or adaption. (Tr. 168-169). However, Dr. Graham did indicate Plaintiff was moderately limited in social interaction in such situations as interaction with the general public, being able to accept instructions, being able to get along with coworkers, and being able to maintain socially appropriate behavior. (Tr. 169).

Dr. Patricia Beera, on October 2, 1997, also evaluated Plaintiff's capacity assessment. (Tr. 172). Dr. Beera reported that, under Listing 12.04 Affective Disorders, Plaintiff suffered from disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by Plaintiff's adjustment disorder with depression. (Tr. 175). Additionally, Dr. Beera reported that, under Listing 12.08 Personality Disorders, Plaintiff showed inflexible and maladaptive personality traits which cause either significant impairment in social or occupational functioning or subjective distress, as evidenced by Plaintiff's pathologically inappropriate suspiciousness or hostility. (Tr. 177). In terms of Plaintiff's degree of limitation, Dr. Beera indicated a slight degree of limitation in restriction of activities of daily living, a moderate degree of limitation in difficulties in maintaining social functioning, and seldom deficiencies with concentration, persistence or pace. (Tr. 179). On November 11, 1997, Dr. John Tomassetti performed the same evaluation as Dr. Beera, and like Dr. Beera, Dr. Tomassetti reported the exact same limitations. (Tr. 181).

Plaintiff returned to see Dr. Eilers on October 30, 1997. (Tr. 269). Apparently Plaintiff had

11

increased pain in his back from trying to put up plastic over his windows to keep the winter cold out. (*Id.*). Dr. Eilers reported Plaintiff's myofascial trigger points were somewhat increased and recommended Plaintiff start doing more stretching and strengthening activities. (*Id.*). Dr. Eilers also reminded Plaintiff to limit himself to light/sedentary work. (*Id.*).

Plaintiff again saw Dr. Eilers on December 18, 1997. (Tr. 268). Dr. Eilers report of December 18, 1997 reiterated most of what was stated in his October 30, 1997 report except that in December Dr. Eilers prescribed Prilosec due to Plaintiff's history of gastritis. (*Id.*). Additionally, Dr. Eilers renewed Plaintiff's prescription of Elavil and again recommended light/sedentary work. (*Id.*).

For what appears to have been the last time, Plaintiff saw Dr. Eilers on February 5, 1998. (Tr. 267). Dr. Eilers reported Plaintiff remained medically and neurologically stable since seeing Plaintiff in December 1997 and that Plaintiff's status had not significantly changed. (*Id.*). Dr. Eilers recommended conservative counseling and management or, if possible, more formalized counseling. (*Id.*). Dr. Eilers continued Plaintiff on Elavil and reminded Plaintiff that he is going to continue to have significant limitations and will need to look for sedentary type work. (*Id.*).

The record contains no medical reports for Plaintiff from February 1998 to February 1999. However, on February 15, 1999, Plaintiff saw Dr. Kundan Gupta of BroMenn Healthcare. (Tr. 320). Dr. Gupta performed five discograms at various locations. (*Id.*). At the L1-L2 level, saline was injected in the disc space, producing no pain. (*Id.*). At the L2-L3, saline was also injected in the disc space, however, Plaintiff experienced slight discomfort in his lower back. (*Id.*). At the L3-L4 and L4-L5, saline was injected in the disc space, producing no pain. (*Id.*). Plaintiff experienced the most pain at the L5-S1 level, wherein, after saline was injected into the disc space, Plaintiff stated

the pain was an 8 to 9 on a scale of 10. (*Id.*). Additionally, the pain at the L5-S1 level radiated to the right posterior leg. (*Id.*).

Plaintiff saw Dr. Gupta again on March 3, 1999 at the Cental Illinois Neurohealth Sciences, Division of Neuroradiology. (Tr. 318). Dr. Gupta found a loss of signal space at L2-L3, L3-L4, L4-L5, and L5-S1 mostly due to desiccation. (*Id.*). Specifically, at L2 and L3, Dr. Gupta reported a central bulging disc. (*Id.*). At L3 and L4, there is a central herniation of the disc causing compression of both nerve roots as well as slight narrowing of both neural foramina. (*Id.*). At L4 and L5, there is a diffuse bulging disc with slight narrowing of both neural foramina. (*Id.*). Lastly, at L5 and S1 there is a diffuse bulging disc but the neural foramina are normal. (*Id.*). Dr. Gupta concluded that Plaintiff has moderate spinal stenosis at L3 and L4 due to a central herniation of the disc, as well as narrowing of both lateral recesses. (*Id.*). Also, Dr. Gupta note the MR Myelography shows an extradural defect noted at the L3 and L4. (*Id.*).

On March 9, 1999 Plaintiff was admitted for a L3-L4 decompressive laminectomy with microdiskectomy procedure. (Tr. 327). Dr. Micheal Amaral of BroMenn Healthcare performed the procedure. (*Id.*). On March 10, 1999, a three and one-half incision was made over Plaintiff's L3-L4. (*Id.*). Dr. Amaral reported that dissection was carried down to the posterior lumbar fascia and the fascia was separated from the posterior spinous processes bilaterally. (*Id.*), Additionally, a large amount of degenerative disc fragment was removed and a good decompression of the nerve root on that side was achieved. (*Id.*). No complications were noted and Dr. Amaral reported no further disc bulges could be seen. (*Id.*). However, on March 12, 1999, Plaintiff experienced chills, nausea and a headache and he was unable to take a deep breath due to discomfort. (Tr. 326). Plaintiff was given a host of medications including: Surfak, Librium, Folate, Thiamin, multivitamins, Prilosec, Demerol,

and Valium. (*Id.*).

Plaintiff saw Dr. Amaral on April 21, 1999 for a follow-up to the decompressive laminectomy with microdiskectomy procedure. (Tr. 332). Dr. Amaral reported that Plaintiff had done relatively well since the procedure except for some continuing back pain most likely secondary to back reconditioning. (*Id.*). Dr. Amaral proposed Plaintiff proceed with back reconditioning under supervision of a physiatrist. (*Id.*). However, Dr. Amaral indicated Plaintiff refused, stating that he will train on his own. (*Id.*). Dr. Amaral noted Plaintiff had good strength in the lower extremities and flexion/extension x-rays showed no Subluxation or postoperative instability. (*Id.*). Having nothing further surgical to offer Plaintiff, Dr. Amaral did not see Plaintiff again. (*Id.*).

## IV.   STANDARD OF REVIEW

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the ALJ." *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir. 1987) (citation omitted); *see also Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the Commissioner's delegate the ALJ)." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971), *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988). "Substantial evidence"

is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987), *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th Cir. 1989), *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V.  **FRAMEWORK FOR DECISION**

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied his application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological

15

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[3] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[4] A severe impairment is one which significantly limits the claimant's physical or

---

[3]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

[4]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found

not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 ( 7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.    ANALYSIS

The court will proceed through the five step analysis in order.

A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that Plaintiff had not engaged in any substantial gainful activity at any time relevant to his decision issued on January 13, 1999. (Tr 20).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and eighty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and

18

the court finds no reason to disturb this finding. The ALJ's determination as to Step One of the Analysis is affirmed.

B. Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis the ALJ found Plaintiff suffered from severe impairments. Specifically, the ALJ found Plaintiff suffered from severe degenerative disc disease of the lumbar spine, a dysthymic disorder and alcohol dependence. (Tr. 24-25).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party and the court finds no reason to disturb it. The ALJ's finding as to Step Two of the Analysis is affirmed.

C.      Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. (Tr. 25) The ALJ found Plaintiff's alleged pain and functional limitations not credible as they are not supported by the medical evidence. (*Id.*).

Plaintiff does not challenge the ALJ's findings and substantial evidence exists to support the ALJ's finding and the court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Three of the Analysis is affirmed.

D.      Step Four: Is the claimant capable of performing work which the claimant performed in the past?

In performing the analysis for Step Four, the ALJ determined that Plaintiff is unable to perform any of his past relevant work as a truck driver. (Tr. 25) The finding of the ALJ as to Step

19

Four of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step Four of the Analysis is affirmed.

E.     Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?

At Step Five The ALJ determined that although Plaintiff's Residual Functional Capacity ("RFC") did not allow him to perform the full range of light work, there existed a significant number of jobs in the national economy that he can perform. Specifically, the ALJ found that Plaintiff regained the capacity for a range of light work activity within six months of his injury. (Tr. 22). The ALJ determined that Plaintiff's RFC includes an individual who is "limited to a full range of light work, except that there should be no lifting of more than 10 pounds. There should be reduced interaction with others, ... [and] no continuous repetitive movements of the upper extremities." (Tr. 57). To support the RFC determination, the ALJ noted the testimony of Plaintiff and the findings of Dr. Eilers who consistently told Plaintiff he would be unable to return to work as a truck driver but was capable of lighter work activity. (Tr. 22). The ALJ also addressed Plaintiff's mental RFC.

In determining mental RFC, the first step in the procedure is to assess the nature and extent of the claimant's mental limitations and restrictions (20 C.F.R. § 416.945 (c)). This information is then used to determine the Mental RFC. In order to properly assess an individual's level of functioning due to a mental disorder, evaluation of the impairment must take into account the severity of the impairment over a period of time.(20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1 12.00 (d)). This information is then used to complete Plaintiff's vocational assessment.

Dr. Langut completed a psychological evaluation of Plaintiff on August 29, 1997. (Tr. 23).

20

During this evaluation, Plaintiff informed Dr. Langut that he drank to the point of intoxication several times each week and he used alcohol as a pain killer. (Tr. 257). Additionally, the Plaintiff reported to Dr. Langut that he has feelings of hopelessness and resentment towards society. (Tr. 258). With regards to Plaintiff's alcohol dependency, the ALJ found Plaintiff's alcohol abuse "would not prevent the performance of unskilled work." (Tr. 23). Additionally, the ALJ noted that there are no records that Plaintiff received treatment for his condition or even made a good faith effort at rehabilitation. (*Id.*). In terms of the dysthymia (depression), the ALJ found that the record does not support a finding of disabling depression. Prior to his psychological evaluation by Dr. Langut, it appears Plaintiff had not received treatment from a mental health professional regarding his feelings of hopelessness or resentment.

Ultimately, the ALJ found Plaintiff's functional restrictions fail to establish a disabling mental condition. (*Id.*). Even with feelings of hopelessness and resentment, Plaintiff's daily activities appear only slightly restricted. The ALJ found that Plaintiff is able to care for his personal needs, do light housework, and engage in activities such as fishing (although only from the dock). (*Id.*) The Plaintiff does not engage in many social situations as he tends to keep to himself, but does at times visit friends. (*Id.*). Although Dr. Eilers noted Plaintiff tended to be irritable and threatening to others, there is no evidence of altercations with others or problems interacting with others. (*Id.*). It appears Dr. Eilers based this finding on Plaintiff's own testimony. The ALJ ultimately found, and the Magistrate Judge agrees, that Plaintiff has moderate restrictions in social functioning, and he could function in a work setting with reduced interaction with others. (*Id.*). Given these limitations, vocational expert James Ragains was still able to identify positions as an office cleaner (30,000 in Illinois) or as an unskilled cashier (20,000 in Illinois) that Plaintiff could perform. (Tr. 58).

Plaintiff argues that, although the ALJ found the Commissioner satisfied the burden of showing there are other jobs existing in the national economy that Plaintiff can perform, the evidence does not support the ALJ's position in this regard.. (Mem. in Supp. of Review of Decision of Comm'r of the Social Security Admin. at 2). Plaintiff first cites Dr. Eilers deposition before the Industrial Commission as support for his position. (*Id.*). Specifically, Plaintiff argues Dr. Eilers testified that "if the Plaintiff exceeds a weight restriction of 25 to 30 pounds, 'he is going to have a problem with that disk herniation.'" (Tr. 291). However, Dr. Eilers also stated that if Plaintiff stays below 25 to 30 pounds and could alternate positions, Plaintiff would be able to do sedentary light or light-medium work. (*Id.*). Plaintiff further argues that the vocational expert who testified before the ALJ indicated that there were only a limited number of jobs that Plaintiff can qualify for, given his limitations, and even jobs such as telemarketing, unskilled cashiering, or other light-duty or sedentary positions might be precluded if the prospective employer was not willing to be flexible in the hours the individual could work. (Mem. in Supp. of Review of Decision of Comm'r of the Social Security Admin. at 2)(*citing* Tr. 57-60). Taken as whole, the Plaintiff argues, the decision of the ALJ and the Secretary are not supported by the evidence and proper weight was not given to the opinion of Plaintiff's treating physician. (*Id.*).

Plaintiff's arguments are rather confusing given the record before the Magistrate Judge. First, Plaintiff puts forth an argument that Dr. Eilers testified that Plaintiff should not exceed 25 to 30 pounds or Plaintiff may have a problem with disk herniation. The Magistrate Judge agrees, but so did the ALJ. The ALJ's determination of Plaintiff's RFC included a limitation that Plaintiff be "limited to a full range of light work, except that there should be no lifting of more than 10 pounds." (Tr. 57). It appears the ALJ not only took Dr. Eilers concern of possible injury to Plaintiff for lifting

25 to 30 pounds as serious, but also restricted that limitation even further. As for the weight given to Plaintiff's treating physician (Dr. Eilers), on numerous occasions Dr. Eilers informed Plaintiff that, although he will be unable to drive trucks, he is able to do light sedentary work. (Tr. 267-270).

Lastly, Plaintiff argues jobs such as telemarketing, unskilled cashiering, or other light-duty or sedentary positions might be precluded if the prospective employer was not willing to be flexible in the hours that the individual could work. (Mem. in Supp. of Review of Decision of Comm'r of the Social Security Admin. at 2)(citing Tr. 57-60). This argument is completely contradictory to the testimony provided by the vocational expert Mr. Ragains at the August 1998 hearing:

> Atty: And you're also assuming that they would be able to work an 8-hour shift? Is that what you are assuming?
>
> Ragains: Yes.
>
> Atty: Okay. Would that be limited if he was not able to work, if he was limited in terms of the hours that he is able to actually stand and sit and concentrate?
>
> Ragains: Well, I think no. No. Not for these positions. *I think for these type of positions, the two specific ones I stated, there would be variability or flexibility in the hours that such and [sic] individual could work or that an employer is looking there to fill.*

(Tr. 60) (emphasis added). Therefore, plaintiff's argument that the ALJ's decision is not supported by the evidence or that proper weight was not given to Plaintiff's treating physician is disregarded as unfounded.

Substantial evidence exists to support the ALJ's finding and this court finds no reasons to disturb it. Therefore, the ALJ's determination as to Step Five of the Analysis is affirmed

## VII.  <u>CONCLUSION</u>

For the reasons stated above, this court finds that the ALJ's findings at each step of the sequential analysis are supported by substantial evidence. Therefore, Plaintiff's motion for summary judgment is denied.  Defendant's motion for summary judgment is granted

**ENTER:**

**P. MICHAEL MAHONEY, MAGISTRATE JUDGE**

**UNITED STATES DISTRICT COURT**

**DATE:** 1/13/03